**THIRD DIVISION**
**ANDREWS, P. J.,**
**DILLARD and MCMILLIAN, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**November 21, 2013**

# In the Court of Appeals of Georgia

A13A1055. PETRAKOPOULOS et al. v. VRANAS.

MCMILLIAN, Judge.

George A. Petrakopoulos, Sam Mellas and Alpha Soda Company ("Alpha Soda") appeal, claiming error in the trial court's appointment of a "receiver/special master" and its grant of preliminary and permanent injunctive relief without the proper notice and hearing in an action filed by Gus Vranas arising out of a business dispute among the parties. Petrakopoulos, Mellas and Alpha Soda also appeal the trial court's denial of their motions for summary judgment as to certain claims for damages asserted by Vranas in his complaint as amended. For the reasons set forth below, we reverse the trial court's order appointing a receiver/special master, and we affirm in part and reverse in part the denial of summary judgment.

In 1991, Mellas, Vranas, and Petrakopoulos formed a partnership known as "MVP Investment Company" ("MVP")[1] "for the purpose of conducting the general business of developing, buying, selling, renting and investing in real property."[2] Each partner had a one-third share of the partnership's profits and losses. Petrakopoulos was named as managing partner in MVP's "Partnership Agreement" (the "Partnership Agreement"), which required him, inter alia, to "keep accurate books of account in which all matters relating to the [p]artnership, including all income, expenditures, assets, and liabilities thereof, shall be entered." Additionally, Petrakopoulos and Mellas were given the duties of collecting and receiving rentals on the partnership's

---

[1] Although MVP was named as a defendant in this lawsuit, it is not a party to this appeal.

[2] We note at the outset that Vranas's brief fails to comply with Court of Appeals Rule 25 requiring that "[r]ecord and transcript citations shall be to the volume or part of the record or transcript and *the page numbers that appear on the appellate record* or transcript *as sent from the trial court*." (Emphasis supplied.) Instead, the brief cites to the original page numbers found on the deposition transcripts incorporated into the appellate record. This lack of compliance has greatly hampered the Court's review, as the deposition page numbers appear at the top of the page, under the appellate record binding. Additionally, both sides, when citing to documents, failed to cite to the pages in the appellate record where those documents actually appear, instead citing to pages where such documents were discussed, further hampering our review.

property, paying bills and expenses incurred in the operation and management of the property, and supervising and coordinating maintenance personnel.

The Partnership Agreement provided that the partnership was to survive until dissolved by mutual agreement of the partners or upon other specified events. It also provided that if a partner defaulted, a majority interest of the remaining partners could elect, upon giving the proper notice, to terminate the defaulting partner's interest, "without affecting a termination of the Partnership."[3] The partners who choose to terminate a defaulting partner's interest are then required to purchase the terminated partner's interest according to a formula set out in the Partnership Agreement, either in cash or by note, at the purchasing partners' election.

In 1999, MVP entered into a ten-year lease with Alpha Soda (the "Lease") whereby Alpha Soda rented restaurant space in a building owned by MVP. Petrakopoulos and Mellas owned Alpha Soda, and Petrakopoulos executed the Lease both as MVP's managing partner and as Alpha Soda's president. Under the terms of the Lease, Alpha Soda paid $8,000 per month for the first lease year, with a five

---

[3] It appears that the use of the word "affecting" may have been a typographical error, and that the provision should more properly read "without effecting a termination of the Partnership."

percent increase per year through the ten-year lease term. Vranas described Alpha Soda as MVP's "major tenant."

In December 2008, Petrakopoulos notified Vranas that Alpha Soda was having economic difficulties and was cutting its rent back to $6,000 per month. Under the terms of the Lease, the monthly rent would have been around $13,000 at that time. Vranas told Petrakopoulos that the rent reduction "[was] not right," and he should handle the situation "as [if] the landlord was a stranger and not us." Vranas felt that a $6,000 rental payment was below the market.

Despite the disagreement about Alpha Soda's reduced rent, however, Vranas agreed to sign a guaranty of MVP's refinancing of a bank loan in May 2009 (the "May 2009 Guaranty").[4] Shortly thereafter, Petrakopoulos notified Vranas that Alpha Soda was "no longer profitable" and could no longer pay rent. And in a series of letters and emails, Petrakopoulos asked Vranas for additional capital contributions to pay MVP's debts and to cover management fees he claimed were owing to him and to his son, who had assisted him in managing the partnership.

---

[4] The bank has not made a demand on Vranas's guaranty, and the loan is not in default.

But Vranas contends that during this same period, Petrakopoulos and Mellas were, inter alia, taking funds from MVP's accounts without authorization, improperly crediting Alpha Soda's account with payments that were never made to MVP, and paying Petrakopoulos's son management fees and other amounts with MVP funds without the approval of the other partners. Vranas also presented evidence that Petrakopoulos and Mellas had not properly accounted for all of these transactions in the partnership records.

On December 10, 2009, Petrakopoulos notified Vranas that "[due] to personal and health reasons," he would not longer be able to serve as MVP's managing partner and requested that Vranas take over the management duties. And on December 16, 2009, Petrakopoulos sent Vranas a certified letter giving him ten days to pay a capital contribution of $51,446.73 or he would be in default, entitling Mellas and Petrakopoulos to exercise their rights under the Partnership Agreement to buy Vranas out.[5] Vranas replied by letter dated December 28, 2009, refusing to make any payment and asserting that the other partners were not in compliance with the

[5] Nevertheless, Petrakopoulos stated that he returned Vranas's $15,000 check sent as a capital contribution in July 2009.

5

Partnership Agreement. His letter further indicated that his partnership interest was "up for sale."

On March 10, 2010, Petrakopoulos, as MVP's managing partner, sent Vranas a letter declaring him to be in default under the Partnership Agreement and proffering notes from Petrakopoulos and Mellas in payment for Vranas's partnership interest. But by letter dated March 18, 2010, Vranas notified Petrakopoulos and Mellas that they were in default of the Partnership Agreement by failing to fulfill their duties thereunder and that Vranas "[was] prepared to vigorously defend his interests in the [p]artnership." Subsequently, Mellas and Petrakopoulos had Vranas removed from the tax records of the partnership and allegedly split Vranas's capital account between them.

Vranas filed suit on February 16, 2011, and the lawsuit as amended seeks an accounting, dissolution of the partnership, removal of the managing partner and damages based on various theories of liability. Petrakopoulos,[6] Mellas and Alpha Soda each filed answers and motions to dismiss and later filed motions for summary judgment. But the trial court denied those motions, and on September 6, 2012, scheduled a status hearing for September 24, 2012, "for the parties to show cause why

---

[6] Petrakopoulos also filed a counterclaim.

6

an auditor should or should not be appointed pursuant to OCGA § 9-7-3. See also OCGA § 9-7-17. *Williams v. Tritt*, 262 Ga. 173 (1992)." In the interim, on September 21, 2012, Vranas filed a motion to appoint an auditor.

At the status hearing, the trial court heard argument from the parties and then orally granted Vranas's motion for the appointment of an auditor, naming attorney Joseph Randazzo as his appointee. Randazzo indicated, however, that he would be "more comfortable" being characterized as a "special master," explaining that this case was unique because it appeared to require a combination of a receiver and a special master. The trial court directed Randazzo to prepare his own appointment order and to circulate it among the parties.

Although the appellate record suggests that Randazzo prepared such an order,[7] the limited record designated by the parties contains no indication of whether the proposed order was circulated to counsel or whether any party objected to it before the trial court signed it on November 7, 2012. The order appointed Randazzo as "Receiver/Special Master for the remainder of the pendency of this litigation" (the "Appointment Order"). The trial court also entered a separate "Order Opening

_____

[7] The order indicates that it was prepared by Randazzo, but the line for his signature is blank.

7

Registry Account and Requiring Registry Payment," also apparently prepared by Randazzo, to pay him for his services (collectively with the Appointment Order, the "November 7 Orders").[8]

The Appointment Order provided that:

[the] Receiver/Special Master shall determine as a result of his own examination or after hearing evidence from all related parties the following:

1) The value of assets held by [MVP];

2) Whether any of the [MVP] partners are in default of their obligations under the partnership agreement;

3) Whether [Alpha Soda] or any [MVP] partners have been unjustly enriched based on loans and rent transactions between the two parties;

4) Whether [MVP] should undergo a partnership dissolution;

5) Whether any parties have breached any fiduciary duties and any related damages;

---

[8] That same day, and just a few minutes after the trial court entered the November 7 Orders, Vranas filed an amended motion to request the appointment of "an auditor *or* a receiver." Thus, it appears that the trial court did not consider this amended motion before issuing the November 7 Orders.

6) Whether attorney fees should be awarded to any parties; and

7) Any other issues that may arrive or become relevant.

The Appointment Order also "immediately, preliminarily and permanently enjoined" Petrakopoulos, Mellas and Alpha Soda from interfering with the Receiver/Special Master or taking certain actions in connection with their business. Petrakopoulos, Mellas and Alpha Soda subsequently filed a direct appeal of the November 7 Orders.

1. As an initial matter, we must determine whether we have jurisdiction to consider this appeal. See *American Mgmt. Svcs. East, Inc. v. Fort Benning Family Communities, LLC*, 318 Ga. App. 827, 828 (1) (734 SE2d 833) (2012) ("It is incumbent upon this Court to inquire into its own jurisdiction") (citation and punctuation omitted). Vranas filed a motion to dismiss the appeal, arguing that a direct appeal was not authorized from the November 7 Orders because although the trial judge stated in the Appointment Order that he was appointing a "receiver/special master," he was actually appointing an auditor, which Vranas asserts is not an appealable order.

However, in addition to appointing a "receiver/special master," the Appointment Order issued an immediate, preliminary and permanent injunction

9

against Petrakopoulos, Mellas, and Alpha Soda. Subsection (a) (4) of OCGA § 5-6-34 allows direct appeals from "[a]ll judgments or orders . . . *for interlocutory or final injunctions*." (Emphasis supplied.) Vranas argues that the injunctive relief ordered by the trial court in the Appointment Order was insufficient to allow for a direct appeal because it was merely ancillary to the appointment of Randazzo as an auditor. But because the Appointment Order's injunction is both permanent and extremely broad, it goes beyond merely facilitating Randazzo's appointment. For example, as written, the injunction permanently prevents Petrakopoulos, Mellas, and Alpha Soda from "making any business related disbursements," from "making any . . . loans," and from "selling, destroying or depleting any asset" in their possession without limiting the injunction to the partnership accounts, assets or business. The November 7 Orders, therefore, are appealable under OCGA § 5-6-34 (a) (4). See also OCGA § 5-6-34 (d).

Accordingly, we find that we have jurisdiction over this appeal, and Vranas's motion to dismiss is denied.

2. Petrakopoulos, Mellas and Alpha Soda assert that the trial court erred in appointing a receiver/special master and granting injunctive relief without notice and a hearing. But Vranas again asserts that Randazzo was appointed as an auditor, not

10

a receiver, and the parties received notice and a hearing with regard to the appointment of an auditor.

We review the trial court's decision appointing an auditor, a receiver, and/or a special master for an abuse of discretion. See *Alston & Bird, LLP v. Mellon Ventures II, L.P.*, 307 Ga. App. 640, 647 (6) (a) (706 SE2d 652) (2010); *E. I. DuPont de Nemours & Co. v. Waters*, 287 Ga. 235, 236 (695 SE2d 265) (2010); *Treu v. Humanism Inv., Inc.*, 284 Ga. 657, 659 (670 SE2d 409) (2008).

It is undisputed that the trial court provided the parties notice and a hearing with regard to the appointment of an auditor. And it was at that hearing that the appointee, Randazzo, first raised the possibility that he should be appointed as a receiver and/or a special master. Thus, the parties had no prior notice that the appointment of a receiver or a special master would be considered by the trial court. And although at one point, the trial court referred to Randazzo as a "special master, receiver/special master – he is what he is," the court also subsequently referred to Randazzo as an "auditor." Accordingly, the trial court never specifically indicated that it would be appointing Randazzo as a receiver/special master at the hearing.

Georgia law distinguishes between the role played by a receiver and an auditor. A trial court may appoint an auditor in all cases "involving matters of account, if the

11

case shall require it," "to investigate the matters of account and report the result to the court." OCGA § 9-7-3. Thus, "unless modified by the order of appointment," an auditor generally is granted the authority "to hear motions, allow amendments, and pass upon all questions of law and fact," including the "power to subpoena and swear witnesses and compel the production of papers." OCGA § 9-7-6. And "[u]nder OCGA § 9-7-1, the duties previously performed by a 'master' in the superior court are now performed by an 'auditor,' although Uniform Superior Court Rule ("USCR") 46, which was adopted effective June 4, 2009, permits the trial court to appoint a special master to perform certain duties enumerated therein." (Citation omitted.) *Mellon*, 307 Ga. App. at 642 (1).

Uniform Superior Court Rule 46 lists a number of tasks for which a special master may be appointed, including "to investigate and report to the court on matters identified by the court," USCR 46 (A) (1) (e), "to conduct an accounting," USCR 46 (A) (1) (f), and to "make or recommend findings of fact on issues to be decided by the court without a jury if appointment is warranted by . . . the need to perform an accounting, to resolve a difficult computation of damages." USCR 46 (A) (1) (h) (ii). The rule also requires that "[t]he court must give notice and an opportunity to be heard before appointing a master." USCR 46 (B) (1).

12

In contrast, a receiver is generally appointed "[w]hen any fund or property is in litigation and the rights of either or both parties cannot otherwise be fully protected or when there is a fund or property having no one to manage it." OCGA § 9-8-1. Thus, for example, "[e]quity may appoint receivers to take possession of and protect trust or joint property," OCGA § 9-8-2, or to hold "assets charged with the payment of debts where there is a manifest danger of loss, destruction, or material injury to those interested." OCGA § 9-8-3. Additionally, the Georgia Code provides that "[t]he power of appointing receivers should be prudently and cautiously exercised and except in clear and urgent cases should not be resorted to." OCGA § 9-8-4. Although in extraordinary circumstances, "a receiver may be appointed . . . without notice to the . . . person having charge of the assets," OCGA § 9-8-3, "[a] receiver ordinarily should not be appointed without notice and hearing." (Citations omitted.) *Dixie-Land Iron & Metal Co., Inc. v. Piedmont Iron & Metal Co.*, 233 Ga. 970, 972 (213 SE2d 897) (1975).

Thus, auditors and special masters primarily assist the trial court in resolving issues in the litigation, while a receiver acts as a guardian over funds or property at issue in the litigation and should be appointed only in clear and urgent cases. As the Appointment Order makes no finding that this case presents a clear and urgent

13

situation and nothing in the order vests Randazzo with guardianship of the partnership accounts or its other assets, it appears that, despite the order's language appointing Randazzo as a "receiver/special master," the trial court actually intended to appoint him in the capacity of an auditor and/or a special master to assist the trial court in determining the issues in the case.

And even though the parties were on notice that the trial court was considering the appointment of an auditor, the trial court's failure to provide notice to the parties and an opportunity to be heard before also appointing Randazzo as a special master violated USCR 46 (B) (1) and thus was an abuse of discretion. See *Standard Bldg. Co., Inc. v. Schofield Interior Contractors, Inc.*, 315 Ga. App. 516, 520 (3) (726 SE2d 760) (2012).[9] Moreover, Rule 46 requires that an order of appointment,

> itself, must also contain specific enumerated provisions. . . . [For example,] the order must set forth, among other things, the special master's duties, specific limits on the special master's authority, and

---

[9] This Court nevertheless refused to consider the issue of notice in that case because the appellants did not appeal or otherwise object to the appointment order, but rather waited until after the special master issued his report before contesting his appointment without notice. *Standard Bldg. Co.*, 315 Ga. App. at 520 (3). We find that the appellants in this case raised a timely objection by appealing the appointment order.

14

standards for reviewing the special master's orders, findings, and recommendations. Rule 46 (B) (2).

*E.I. DuPont de Nemours*, 287 Ga. at 238. The Appointment Order also fails to comply with Rule 46 because it does not address all the issues mandated by the rule. We find, therefore, that the Appointment Order is subject to reversal based upon its failure to comply with Rule 46.

Additionally, Georgia law provides that no interlocutory injunction shall be issued without notice to the adverse party, OCGA § 9-11-65 (a) (1), and likewise no permanent injunction may be issued without the proper notice.

> Before a court enters a permanent injunction, it must give notice of a hearing at which permanent injunctive relief will be considered, unless the parties agree otherwise. Here, the trial court failed to give such notice before the hearing[, nor was any injunctive relief mentioned at the hearing], and nothing in the record indicates that [Petrakopoulos, Mellas or Alpha Soda] consented to the entry of [any] injunction[, permanent or otherwise].

(Citation omitted.) *Wang v. Liu*, 292 Ga. 568, 572-573 (2) (740 SE2d 136) (2013). See also *Ferdinand v. City of Atlanta*, 285 Ga. 121, 124 (674 SE2d 309) (2009) (trial court's erroneous issuance of a permanent injunction after hearing on city's motion for interlocutory injunction violated procedural notice requirements and could not be

15

affirmed under the "right for any reason" rule); *Smith v. Guest Pond Club, Inc.*, 277 Ga. 143, 144-145 (1) (586 SE2d 623) (2003) (absent agreement of parties and entry of consolidation order, trial court was not authorized to enter permanent injunction, where scheduling order provided fair notice only of hearing to address request for temporary restraining order). Here, the trial court issued both preliminary and permanent injunctive relief without providing any prior notice that it was considering such an award. The Appointment Order, therefore, is also subject to reversal on this basis.

Accordingly, we reverse and remand for further proceedings in accordance with this opinion.

3. Petrakopoulos, Mellas and Alpha Soda also assert that the trial court erred in denying their motions for summary judgment as to certain of Vranas's claims seeking damages against Petrakopoulos, Mellas and Alpha Soda.[10]

---

[10] We consider only the claims Petrokopoulos, Mellas and Alpha Soda properly raise and brief on appeal, and we deem abandoned for appeal any other arguments raised below in conjunction with the motions for summary judgment. See *Sparks v. Jackson*, 238 Ga. 599 (234 SE2d 514) (1977); *Capital Land USA, Inc. v. Mitsubishi Motors Credit of America, Inc.*, 308 Ga. App. 71, 73 (2) (706 SE2d 590) (2011). For example, in their reply brief, the appellants reply to Vranas's argument in his Appellee's Brief regarding the application of the statute of limitation , but they do not assert on appeal that they are entitled to summary judgment on this ground, even though Petrakopoulos made such an argument below. Accordingly, we do not address

Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. A de novo standard of review applies to an appeal from a grant or denial of summary judgment, and we view the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant.

(Citation omitted.) *Davis v. VCP South, LLC*, 321 Ga. App. 503, 503 (740 SE2d 410) (2013).

In considering the issues on summary judgment, we note that the transactions among the parties were numerous and somewhat complex, and in the absence of a full accounting, factual questions remain as to their nature and scope. We now turn to the individual claims asserted by Vranas.

(a) *Fraud and Misrepresentation*.[11] In Vranas's third amended complaint, he asserted a claim of fraud based on allegations that Petrakopoulos and Mellas assured him that Alpha Soda would continue to pay rent of $13,500 per month and common area expense if Vranas would agree to sign the May 2009 Guaranty. He also alleged

the statute of limitation argument on appeal.

[11] Because the parties share common arguments as to some of the claims, we address the arguments on summary judgment by claim, rather than by party.

17

that Petrakopoulos and Mellas fraudulently manipulated the partnership books and commingled funds in an effort to oust him from the partnership.

We find that Vranas has presented sufficient evidence to raise jury issues with regard to his fraud claims. For example, Vranas averred that Petrakopoulos assured him that Alpha Soda would continue to pay over $13,000 in monthly rent it owed, which induced Vranas to sign the May 2009 Guaranty, but Alpha Soda immediately stopped paying rent after Vranas signed the guaranty. Vranas also asserted that Mellas assured him that Alpha Soda had enough money to continue paying although they did not discuss a particular amount of rent, inducing Vranas to sign the guaranty. Petrakopoulos, Mellas and Alpha Soda argue on appeal that these representations cannot be actionable, because they represent promises as to future events.

Although Petrakopoulos, Mellas and Alpha Soda are correct that "actionable fraud cannot be based on statements and promises as to future events, there is an exception to this proposition, which is that fraud may be predicated on a promise made with a present intention not to perform." (Citation omitted.) *Kirkland v. Pioneer Mach., Inc.*, 243 Ga. App. 694, 695 (534 SE2d 435) (2000). And the immediacy of Alpha Soda's announcement that it would no longer pay rent after Vranas signed the guaranty raises factual issues as to whether the alleged representations of

18

Petrakopoulos and Mellas were made with such an intent. Moreover, Mellas's alleged statement also included a representation that Alpha Soda was sufficiently solvent to pay its rent. "[F]alse representations of existing or current facts are actionable even if combined with promises as to future events." (Citation omitted.) *Greenwald v. Odom*, 314 Ga. App. 46, 53 (1) (723 SE2d 305) (2012).

Accordingly, factual issues remain as to whether these representations were false, whether they were made with a present intent not to perform, whether Vranas reasonably relied on such representations, whether the representations and the May 2009 Guaranty prolonged Petrakopoulos's and Mellas's control of the partnership affairs, and whether that resulted in damage to Vranas. Additionally, factual issues remain as to whether Perakopoulos and Vranas were acting in their capacity as agents for Alpha Soda in making these representations to Vranas. In Georgia, a corporation is vicariously liable for the torts of its agents that are committed in the prosecution of and within the scope of its business, *Smith v. Hawks,* 182 Ga. App. 379 (355 SE2d 669) (1987), including the agent's fraudulent misrepresentations. *Velten v. Regis B. Lippert, Intercat, Inc.*, 985 F.2d 1515, 1522 (11th Cir. 1993).[12] Further, factual issues

---

[12] Having found that factual issues exist regarding Alpha Soda's vicarious liability for fraud by its agents, which precludes summary judgment, we need not address the "reverse veil-piercing" argument raised by Alpha Soda in reply to

remain as to whether Petrakopoulos and Mellas supplied him with false or incomplete partnership records or whether they fraudulently manipulated the books in order to declare Vranas in default.

Accordingly, the trial court properly denied summary judgment on Vranas's fraud claims.

(c) *Breach of Contract*. Vranas asserted that Alpha Soda had agreed to repay MVP for over $400,000 in loans, which loans included funds improperly diverted from the partnership. In addition, he alleged that Alpha Soda owed MVP on account past due rent, prorated taxes, insurance, utilities and common area expenses.

However, Alpha Soda argues, and we agree, that Vranas has no standing in his individual capacity to seek recovery on Alpha Soda's direct contractual obligations to MVP; rather any such claim must be brought on behalf of the partnership. *Hendry v. Wells*, 286 Ga. App. 774, 786-787 (2) (d) (650 SE2d 338) (2007); *Thompson v. McDonald*, 84 Ga. 5 (2) (10 SE 448) (1889). Accordingly, the trial court erred in

---

Vranas's assertion of this defense in his appellate brief. We note, however, that this Court recently rejected the application of such a theory in the context of fraud. *Holiday Hospitality Franchising, Inc. v. Noons*, __ Ga. App. __ (Case No. A12A2570, decided September 30, 2013). See also *Acree v. McMahan*, 276 Ga. 880, 881 (585 SE2d 873) (2003).

denying summary judgment to the extent that Vranas sought recovery individually on any of Alpha Soda's direct contractual obligations to MVP.

Nevertheless, the Complaint also alleges that Petrakopoulos and Mellas improperly declared funds paid by Alpha Soda to MVP as their own loans and capital contributions to the partnership and otherwise commingled the funds of Alpha Soda and MVP in an effort to declare Vranas to be in default of the Partnership Agreement. And we find that Vranas has presented sufficient evidence of unexplained or contested transactions between Alpha Soda and the partnership to raise jury issues as to whether Petrakopoulos and Mellas breached their obligation to Vranas under the Partnership Agreement. Accordingly, the trial court properly denied summary judgment on any breach of contract claims arising out of the Partnership Agreement.

(d) *Unjust Enrichment.* Alpha Soda asserts that Vranas also cannot assert a claim against it for unjust enrichment because that theory applies only when no contract exists.[13] "Unjust enrichment applies when as a matter of fact there is no legal contract, but when the party sought to be charged has been conferred a benefit by the party contending an unjust enrichment which the benefitted party equitably ought to return or compensate for." (Citations and punctuation omitted.) *Engram v. Engram*, 265 Ga. 804, 807 (2) (463 SE2d 12) (1995). See also *Smith v. McClung,* 215 Ga. App. 786, 789 (3) (452 SE2d 229) (1994).

But as Alpha Soda argued with regard to the breach of contract claims, Vranas had no contractual relationship with the company in his individual capacity. And Vranas has asserted that Alpha Soda, as well as Petrakopoulos and Mellas in their capacity as Alpha Soda shareholders, were unjustly enriched as a result of various transactions at the expense of his interest in the partnership. Given the uncertainty

---

[13] Only Alpha Soda briefed the issue of unjust enrichment on appeal, and based its argument on the Lease. Although Mellas and Petrokopoulos, both non-signatories to the Lease, asserted in their reply brief that Vranas's appellate brief failed to address their arguments on the insufficiency of Vranas's claim for unjust enrichment, they never raised any such arguments in their initial appellate brief. Accordingly, we do not address Vranas's claims of unjust enrichment against Petrakopoulos and Mellas individually.

surrounding those transactions, Alpha Soda has failed to establish that it is entitled to summary judgment on Vranas's claims for unjust enrichment.

(e) *Other claims*. Similarly, because factual issues remain surrounding issues of default under the Partnership Agreement, the breach of any duty owing thereunder, and whether Petrakopoulos dissolved the partnership, we find that the trial court properly denied summary judgment on Vranas's claims of wrongful dissolution of the partnership and breach of fiduciary duty. See *Moses v. Jordan*, 319 Ga. App. 706, 706 (738 SE2d 297) (2013) ("the gravamen of a wrongful dissolution claim is a partner's attempt to appropriate, through the dissolution, the assets or business of the partnership, which may include prospective business, without adequate compensation to the remaining partners.") (citation and punctuation omitted); *AAF-McQuay, Inc. v. Willis*, 308 Ga. App. 203, 211 (1) (c) (707 SE2d 508) (2011) ("Partners owe fiduciary duties to one another to act in the "utmost good faith" and with the "finest loyalty.") (citation and punctuation omitted).[14]

---

[14] Although Mellas argues that he should have been granted summary judgment on Vranas's conversion claim, it does not appear that Vranas is asserting a separate claim based on that cause of action. Although the prayer for relief under Vranas's claim for breach of contract, promissory estoppel and fraud in the Third Amended Complaint does use the word "conversion," the complaint does not raise such a claim, and Vranas does not argue such a claim in opposition to the summary judgment motions or on appeal.

Accordingly, the trial court properly denied summary judgment as to those claims.

*Judgment affirmed in part and reversed in part. Andrews, P. J., and Dillard, J., concur.*